# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JAMES DUVALL, | ) | No. 73416-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| REBECCA NELSON, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: January 3, 2017 |

MANN, J. — In 2006, the Washington State Legislature created the Sexual Assault Protection Order Act (SAPOA), chapter 7.90 RCW, with the intent of creating a civil remedy allowing a victim of sexual assault to obtain a protection order against future interactions with their assailant. In order to obtain a sexual assault protection order, the petitioner must allege, and the court must find, that the sexual conduct or penetration was "nonconsensual"—in other words, that the petitioner did not give consent. "Nonconsensual" is defined by SAPOA to mean "a lack of freely given agreement." RCW 7.90.010(1).

We are asked in this case to decide, (1) whether the ability to consent necessarily requires the petitioner to have the capacity to consent or freely give agreement, and (2) where there is evidence of excessive alcohol consumption, or other impairment, whether the trial court has an obligation to determine if the petitioner had the capacity to consent. We answer both questions in the affirmative.

This case concerns two freshmen students at the University of Washington during the evening and early morning hours of January 9 to 10, 2015. Petitioner Rebecca Nelson attended several fraternity parties during the evening where she consumed a significant quantity of alcohol. Nelson did not remember how she got back to her dormitory, but had a vague memory of the respondent James Duvall being in her dormitory room in the early morning hours. The next morning, believing she had been raped by Duvall, Nelson alerted the campus police and ultimately sought a sexual assault protection order.

During an evidentiary hearing, Nelson testified that she had no memory of the night and did not remember consenting to sex. Duvall agreed that the two had engaged in sexual intercourse, but testified that Nelson had given her verbal agreement. Because Nelson could not remember the specifics of the night, and the only testimony was that of Duvall, the trial court found that there was consent and denied the sexual assault protection order.

The trial court erred as a matter of law in failing to consider and find, based on the evidence, whether, as a threshold matter, Nelson had the capacity to give consent. We reverse and remand for entry of findings.

-2-

FACTS

Rebecca Nelson and James Duvall entered the University of Washington as freshmen in the fall of 2014. Nelson and Duvall resided in the same dormitory. They were acquainted through a mutual friend, had met previously in social settings, but had never dated or spent time alone.

On the evening of January 9, 2015, Nelson worked a closing shift at Starbucks then met up with friends to celebrate a friend's birthday and attended a party at a local fraternity. One of Nelson's friends brought a half-liter water bottle filled with vodka. While all of her friends initially drank from the bottle, Nelson ended up holding onto and drinking from it through the night. Once at the fraternity party, Nelson drank three or four shots of alcohol from the bar along with a juice drink she believed contained alcohol. She continued to drink vodka from the water bottle finishing half of the bottle by midnight. After midnight, Nelson moved to another house party where she continued to drink from the water bottle of vodka. Nelson testified that she drank much more than she would typically drink, that she became heavily intoxicated, and began to lose her memory.

Nelson recalled "Snapchatting" with friends, but didn't remember the contents other than one of her high school friends commenting that she looked drunk.[1] Nelson's testimony was supported by her boyfriend who was not with her that evening. As he described:

> The evening of January 9th, I was going through my fraternity's initiation process and was occupied at my chapter house . . . until around

---

[1] Clerk's Papers (CP) at 8. Snapchat is a cell phone app similar to text messaging except that photos and texts sent through Snapchat disappear once they are seen by the recipient and are not preserved.

4 AM on the 10th. . . . Upon finishing being initiated I was able to check my phone again and noticed many snap chat messages from Becca. As I went through them almost all of them were incoherent, I could not pick out more than one word per picture. In the background I saw Becca with some of her friends that I recognized and saw what appeared to be two separate dorm rooms throughout the dozen or so snapchats. Her last message was from 2:06 AM.

Having interacted with Becca drunk, I knew that when she had consumed a lot of alcohol her text messages became nearly as unreadable as the snapchats, and because her snapchats were much worse than anything she had sent me before I got worried and called her, as I did not know she was going out that night and I was worried about her. I didn't connect and left her a voicemail, asking if she was ok and just checking in. After that I fell asleep.[2]

Nelson vaguely remembered leaving the second party and heading to a third. While she didn't remember how she got there, she remembered ending up at her friend, Shirley Chen's, dormitory room.

According to Chen, at around 1:00 or 2:00 a.m., Nelson told Chen she was going to walk back to her dormitory room—about 10 or 15 minutes away on the other side of campus. Chen testified that she insisted on walking Nelson back to her dormitory "since [Nelson] had been intoxicated and the conditions outside were not too ideal. It was dark out, a little rainy, and her dorm was located across campus." Chen testified that Nelson said she was fine. Although Chen was reluctant, because she felt Nelson "was not completely sober," Chen decided to let Nelson walk back to her dormitory alone. Chen testified that she had been drinking with Nelson several times before, and found Nelson to be "a very laidback and relaxed person and that seems to carry on into her drunken state so it is a bit difficult to judge how intoxicated she really is." Before she left, Chen

_____

[2] CP at 35-36.

told Nelson to text as soon as she got back to her own dormitory. Nelson never sent Chen a text message.

Nelson did not remember getting back to her dormitory or entering her room. She believes she ran because it was cold and at some point she fell down, ripped her jeans, and bruised her knee. Nelson testified that the only thing she remembered the rest of the night was "feeling pain and then like I think James saying 'I need to get rid of this condom.'" She recalled waking up the next morning and feeling pain in her vagina. She noticed her pajama shorts were inside out and that there was blood on the sheets. Later that morning, Nelson told her boyfriend that she thought she had been raped. She then told her parents. With her parents' assistance, she alerted the University of Washington Police who took a statement and collected evidence. She then checked into Harborview Medical Center for a sexual assault exam.

Duvall testified that he communicated with Nelson throughout the night. Duvall testified that around 1 a.m. he sent Nelson a Snapchat message asking her where she was and Nelson responded that she was with some of her friends. He "asked her when she was coming back" and "if she wanted to hang out" when she got back to the dormitory. Nelson reportedly said yes and that her roommate was not there. Duvall asked her to send him a Snapchat when she got back to the dorm.

Duvall testified that around 1:30 or 2:00 a.m., Nelson sent him a Snapchat saying she was back in her room. Duvall sent her a message that he would come knock on her door. When he arrived and knocked she said he could come in. When Duvall walked into the room, he hugged Nelson and they started talking while sitting down on the bed. Duvall testified that Nelson seemed drunk, but not incoherent, she was talking

-5-

normally, was responsive to questions, and was not slurring her words. He testified that when he leaned in to kiss her, she was responsive and kissed him back and when he asked her if she wanted to have sex she said "[y]es." Duvall admitted that he had sexual intercourse with Nelson. After intercourse, Duvall testified that he and Nelson talked for 10 to 15 minutes and that he then turned off her light, gave Nelson her cell phone, and left.

Nelson testified that after returning to school she was "terrified for the next few days until I heard James had been moved out of Alder and that there was a no contact order in place." She testified becoming extremely paranoid of running into Duvall and was afraid of running into him on campus. After learning that neither the prosecutor nor University of Washington were going to take action against Duvall, on March 18, 2015, Nelson filed a petition for a sexual assault protection order in King County Superior Court. She received a temporary sexual assault protection order and notice of hearing. On March 31, 2015, the parties appeared, through counsel, before Pro Tempore Judge Richard Bathum for the return hearing.

At the start of hearing, the court noted that Nelson had submitted a "very thick petition and declarations" and then asked if "the parties think I need to read that?" Nelson responded in the affirmative. The court agreed to read the materials but informed Nelson that the petition may not be given much weight as it was likely full of hearsay. Nelson reiterated that "the Evidence Rules need not apply in these matters, hearsay is generally considered admissible." The court responded that "the Court is going to hear testimony from both sides, and we will take—any documents you want the Court to consider will be marked, admitted and objected to, if necessary, and the Court

will make a decision as to whether or not any documents you have are admissible on that basis." The court heard testimony from Nelson, Nelson's father, and Duvall.

After Nelson presented her case, Duvall moved to dismiss arguing that because Nelson could not remember the events on January 9 to 10, there was no evidence of a lack of consent. Nelson's counsel responded, explaining:

> [NELSON'S COUNSEL]: . . . [n]onconsual means lack of freely given consent. My client's entire case, including her testimony, which is evidence, goes to the fact that there was a lack of freely given consent in this matter.
>
> . . . .
> THE COURT: What evidence do you have that shows that she did not consent?
> [NELSON'S COUNSEL]: Her level of intoxication alone, your Honor.
> THE COURT: Okay. That's it? That's the only thing?
> [NELSON'S COUNSEL]: She blacked—her own testimony shows that she blacked out that night from the amount of alcohol that was consumed. By her estimate, over the course of the night, somewhere between seven and ten shots, which are one and a half ounces each, of hard alcohol with mixers, for a young women of her stature and age is well beyond the legal limit and clearly led to memory loss.
> That kind of intoxication, our argument is, is the basis for the incapacity to give consent.
> I mean by [opposing] counsel's argument, you know, earlier, without expert testimony, the Respondent could have sex with someone in a coma and that would be fine, because they can't testify that they had any memory of it happening.
> The very purpose of these sexual assault protection orders, your Honor, in a civil case with the preponderance of evidence standard is to provide an avenue for sexual assault victims to get some safety and peace of mind. They're specifically designed when criminal cases don't go through, when other options for safety don't apply.[3]

The court denied the motion to dismiss.

After Duvall presented his case and closing arguments, the court issued its oral ruling:

---

[3] Report of Proceedings (RP) (March 31, 2015) at 63-64.

The difficulty in this case is that your client [Nelson] does not remember. Your client does not help us with a lot of what exactly happened in the room.

It could have been consent or it maybe wasn't consent. It's very, very difficult from the testimony that she gave to create any kind of picture as to what happened in this case.

On the other hand, the defendant does give us some testimony in connection with this case. There is agreement that both had been drinking. There is I think agreement that she drank too much.

But the issue here is whether or not this was in effect consensual or not consensual, and because the only testimony that the Court really has that goes to that is from the defendant in this case, the Court finds that there was consent, at least at one point in time.

Waking up the next morning after a night of drinking and maybe not a memory—I don't know what happened there as to why she didn't testify regarding the specific facts of the case. But the Court cannot find in favor of the Petitioner in this case and dismisses the case.[4]

The court continued, however:

There is another thing that anytime I get the opportunity to talk to kids about this which is alcohol. And here in the courthouse we see every kind of drug there is. You name it, we see it.

What's still king? Alcohol is still king. In Alcoholics Anonymous they say cunning, powerful, baffling. Alcohol's not good, especially when you're a good-looking lady running around on campus.[5]

The court denied issuance of the sexual assault protection order checking the box with the form language: "A preponderance of the evidence has not established that there has been nonconsensual sexual conduct or nonconsensual sexual penetration."[6]

## ANALYSIS

In 2006, the Washington State Legislature created the Sexual Assault Protection Order Act (SAPOA), chapter 7.90 RCW, with the intent of creating a civil remedy allowing a victim of sexual assault to obtain a protection order against future interactions

---

[4] RP (March 31, 2015) at 87-89 (emphasis added).
[5] RP (March 31, 2015) at 89-90.
[6] CP at 49-50.

with their assailant. RCW 7.90.005. A petition for a sexual assault protection order may be filed by any victim of "nonconsensual sexual conduct or nonconsensual sexual penetration." RCW 7.90.030(1)(a).[7] The petitioner must allege by affidavit under oath "the existence of nonconsensual sexual conduct or nonconsensual sexual penetration." RCW 7.90.020(1). After a hearing,

> If the court finds by a preponderance of the evidence that the petitioner has been a victim of nonconsensual sexual conduct or nonconsensual sexual penetration by the respondent, the court shall issue a sexual assault protection order.

RCW 7.90.090(1)(a).[8]

We review the trial court's decision to grant or deny a protection order for abuse of discretion and determine if the decision is manifestly unreasonable or exercised on untenable grounds. In re Vulnerable Adult Petition for Knight, 178 Wn. App. 929, 936-37, 317 P.3d 1068 (2014). "A decision is based on untenable grounds or for untenable reasons if the trial court applies the wrong legal standard or relies on unsupported facts." Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 669, 230 P.3d 583 (2010). While we defer to the trial court on the persuasiveness of the evidence, witness credibility and conflicting testimony, we review questions of law de novo. Salas, 168 Wn.2d at 669. We review questions of statutory interpretation de novo. Pham v. Corbett, 187 Wn. App. 816, 831, 351 P.3d 214 (2015).

---

[7] SAPOA does not apply to victims that qualify for a domestic violence order of protection under chapter 26.50 RCW.

[8] The court may not deny the petition based, in whole or in part, on evidence that either the petitioner or respondent were voluntarily intoxicated or that the petitioner engaged in limited consensual sexual touching. RCW 7.90.090(4).

I.

A.

In order to obtain a sexual assault protection order, the petitioner must allege, and the court must find, that the sexual conduct or penetration was "nonconsensual"—in other words, that the petitioner did not give consent. "Nonconsensual" is defined by SAPOA to mean "a lack of freely given agreement." RCW 7.90.010(1). We are asked in this case to decide, (1) whether the ability to freely give consent necessarily requires the petitioner have the <u>capacity</u> to consent or freely agree, and (2) where there is evidence of excessive alcohol or other impairment, the trial court has an obligation to determine and enter a finding of capacity.

Statutory interpretation begins with the plain meaning of the statute. <u>Dep't of Ecology v. Campbell & Gwinn, L.L.C.</u>, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). "It is an axiom of statutory interpretation that where a term is defined we will use that definition." <u>United States v. Hoffman</u>, 154 Wn.2d 730, 741, 116 P.3d 999 (2005). The court's primary objective in interpreting a statute is to ascertain and carry out the legislature's intent. <u>Lake v. Woodcreek Homeowners Ass'n</u>, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). The court may "discern the plain meaning of nontechnical statutory terms from their dictionary definitions." <u>State v. Kintz</u>, 169 Wn.2d 537, 547, 238 P.3d 470 (2010).

Even though SAPOA was enacted in 2006, there is little case law considering its use and interpretation. While other sections of the statute have been addressed and interpreted by this court,[9] no court has addressed whether "nonconsensual" or "a lack of

---

[9] <u>See</u> <u>Roake v. Delman</u>, 194 Wn. App. 442, 449-50, 377 P.3d 258, 262 (2016), addressing the SAPO Act's requirements for a petition, an ex-parte temporary protection order, and a final protection order. "We conclude that the SAPO Act, by its plain language, requires that a petition include an

freely given agreement" necessarily means that the victim have the capacity to consent. We believe that the ability to consent to sexual conduct or penetration, or to freely agree to sexual conduct or penetration, necessarily means that the individual giving consent must have the mental capacity to consent.[10]

This interpretation is consistent with the dictionary definition of what it means to "freely" agree. Webster's defines "freely" as "of one's own accord; with freedom from external control."[11] Synonyms and related words include "voluntarily, willingly, consciously, deliberately, intentionally, knowingly, wittingly."[12] Considering this definition of "freely" the plain language would require the court to find that the victim was acting of his/her own accord, free from external control, willingly, voluntarily, knowingly, and consciously. Being incapacitated due to intoxication, whether it be voluntary or involuntary, or due to mental illness, would necessarily have an adverse effect on a person's ability to act with free will and of their own accord.

Further, in determining legislative intent, the "preamble or statement of intent can be crucial to interpretation of a statute." Towle v. Dep't of Fish & Wildlife, 94 Wn. App. 196, 207, 971 P.2d 591 (1999). In creating the SAPOA, the legislature declared:

> Sexual assault is the most heinous crime against another person
> short of murder. Sexual assault inflicts humiliation, degradation, and terror
> on victims. According to the FBI, a woman is raped every six minutes in
> the United States. Rape is recognized as the most underreported crime;
> estimates suggest that only one in seven rapes is reported to authorities.

---

allegation that the respondent made specific statements or actions giving rise to a reasonable fear of future dangerous acts. However, the Act does not require that a petitioner prove this allegation to obtain a protection order."

[10] Duvall agreed during oral argument that while the language is not in the statute, this interpretation "makes a certain amount of sense."

[11] MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/freely (last visited Dec. 23, 2016).

[12] MERRIAM-WEBSTER ONLINE THESAURUS, https://www.merriam-webster.com/thesaurus/freely (last visited Dec. 23, 2016)

> Victims who do not report the crime still desire safety and protection from future interactions with the offender. Some cases in which the rape is reported are not prosecuted. In these situations, the victim should be able to seek a civil remedy requiring that the offender stay away from the victim. It is the intent of the legislature that the sexual assault protection order created by this chapter be a remedy for victims who do not qualify for a domestic violence order of protection.

RCW 7.90.005. This declaration makes clear that the legislature intended SAPOA to provide a broad civil remedy to protect victims of rape and sexual assault who either choose not to report the sexual assault or do report the assault but the assault is not prosecuted.

Because SAPOA is focused on sexual assault and rape, its terms should be read in harmony with the "sex offenses" chapter of the Washington criminal code, chapter 9A.44 RCW. Hallauer v. Spectrum Properties, Inc., 143 Wn.2d 126, 146, 18 P.3d 540 (2001) (where statutes relate to the same subject matter they must be construed together). It is clear from the legislative declaration in SAPOA that the legislature considered chapter 9A.44 RCW when enacting SAPOA. Further, both statutes define "consent" and "nonconsensual" using the same language. In the criminal code, the term "consent" is defined to mean "that at the time of sexual intercourse or sexual contact there are actual words or conduct indicating freely given agreement to have sexual intercourse or sexual contact." RCW 9A.44.010(7) (emphasis added). In SAPOA, the term "nonconsensual" is defined to mean "a lack of freely given agreement." RCW 7.90.010(1) (emphasis added).

Under the criminal code, a person is guilty of rape in the second degree, when they engage in sexual intercourse with another person "when the victim is incapable of consent by reason of being physically helpless or mentally incapacitated." RCW

9A.44.050(1)(b). Mental incapacity is defined as a "condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, <u>the influence of a substance</u> or from some other cause." RCW 9A.44.010(4) (emphasis added). Thus, when the State can prove the victim was mentally incapacitated at the time of the act, "the victim's words or conduct indicating freely given agreement to have sexual intercourse will not excuse the defendant's conduct." <u>State v. Lozano</u>, 189 Wn. App. 117, 125, 356 P.3d 219 (2015), <u>review denied</u>, 184 Wn.2d 1032, 364 P.3d 120 (2016). For criminal convictions, mental incapacity, including incapacity caused by the "influence of a substance" such as alcohol or drugs, may render a victim incapable of giving consent.

In adopting SAPOA, the legislature was specifically concerned by the large percentage of rapes and sexual assaults that go unreported or unprosecuted each year. RCW 7.90.005.[13] As a result, SAPOA provides additional protection to sexual assault and rape victims, outside of the criminal process. RCW 7.90.005. Considering this legislative intent, it would be illogical to read SAPOA in a manner that ignores whether the victim has the capacity to consent and therefore deny a population of victims the protection of a civil remedy through a sexual assault protection order.

---

[13] From 2006 to 2010, a greater percentage of victimizations perpetrated by someone the victim knew well (62 percent) went unreported to police, compared to victimizations committed by a stranger (51 percent). The statistics showed that "[f]rom 2006 to 2010, victimizations perpetrated by someone who was well known to the victim (62%)—a neighbor, coworker, patient, or teacher—or by someone with whom the victim was casually acquainted (60%) were most likely to go unreported to police. . . . Among the unreported IPV victimizations, 38 percent went unreported because the victim was afraid of reprisal or getting the offender in trouble." LYNN LANGTON ET AL., U.S. DEP'T OF JUSTICE, SPECIAL REPORT: VICTIMIZATIONS NOT REPORTED TO THE POLICE, 2006-2012, at 6 (Aug. 2012), http://www.bjs.gov/content/pub/pdf/vnrp0610.pdf. Additionally 13 percent of rape or sexual assault victims stated they did not report because the police would not or could not help. LANGTON ET AL., at 4 tbl.1.

We hold that for the purposes of reviewing a request for a sexual assault protection order, mental incapacity, including incapacity caused by alcohol or drugs may make the sexual contact or sexual penetration nonconsensual. We conclude that SAPOA was intended to provide a civil protective remedy to all rape victims recognized under criminal law, without exclusion. Therefore, when deciding whether to grant a sexual assault protection order, SAPOA requires the trial court to consider all evidence that can demonstrate "nonconsensual sexual conduct or nonconsensual sexual penetration" or a "lack of freely given agreement." This includes evidence that the victim lacked the mental capacity to consent at the time. While we disagree with Nelson's argument that incapacity caused by alcohol consumption renders a victim incapable of consent "as a matter of law," such impairment, once demonstrated, required further inquiry into the circumstances. Once a claim of "incapacity" is raised, or evidence of "incapacity" is provided, the court must determine, on the record, whether the victim had the capacity to consent.

B.

In this case, Nelson presented evidence to the trial court that she was highly intoxicated at the time of the sexual penetration and argued that her intoxication was the basis for the incapacity to give consent. The trial court fully agreed that Nelson "drank too much" yet determined that because she had no memory, the only relevant evidence was the defendant's testimony regarding the conversation leading up to the act itself and whether or not Nelson gave verbal consent. The court explained: "the issue here is whether or not this was in effect consensual or not consensual. And because the only testimony that the Court really has that goes to that is from the defendant in this case,

-14-

the Court finds that there was consent, at least at one point in time." The trial court's decision failed to sufficiently consider Nelson's evidence that she lacked capacity to consent at the time of the sexual penetration.

When the trial court fails to make necessary findings on ultimate issues of fact, or the decision rests on an improper interpretation of the law, "the appropriate course of action is to remand to the trial judge to apply the correct rule" and make and enter the necessary findings of fact and conclusions of law. Dreiling v. Jain, 151 Wn.2d 900, 907, 93 P.3d 861 (2004); Fed. Signal Corp. v. Safety Factors, Inc., 125 Wn.2d 413, 422, 886 P.2d 172 (1994). We remand to the trial court for consideration of, and specific entry of findings, based on the record, addressing whether Nelson had the capacity to give consent.

On remand, the trial court must consider whether Nelson was incapable of consent due to mental incapacity. The court must consider whether a "condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause." RCW 9A.44.010(4).

In this case, this includes but is not limited to, (1) evidence that Nelson consumed a significant quantity of alcohol throughout the evening and became highly intoxicated; (2) Nelson's memory started fading in and out to the point that she did not remember much of the evening; (3) Nelson's friend was concerned that she had been intoxicated and questioned her ability to walk home; (4) Nelson insisted on walking home by herself across campus around 2 a.m. in January—alone demonstrating she

-15-

may not have meaningfully understood the consequences of her actions; (5) Nelson apparently fell hard enough to rip her jeans and hurt her knee in the process of running home but did not remember the fall; (6) Nelson's Snapchats were incoherent enough to worry her boyfriend; and (7) Nelson neglected to follow through on her promise to text her friend once she arrived at her dorm.

After considering all of this evidence, the trial court must determine whether Nelson carried her burden of proving "nonconsensual sexual penetration" and either grant or deny the sexual assault protection order.

II.

Nelson maintains that the trial court improperly based its denial of the sexual assault protection order on Nelson's voluntarily intoxication in conflict with RCW 7.90.090(4)(b).[14] We disagree.

Although the trial court erred in acknowledging that Nelson's intoxication caused her memory lapses instead of considering whether Nelson had the capacity to consent to sexual conduct,[15] the court's decision does not appear to be based on Nelson's voluntary intoxication. The court interpreted SAPOA to require evidence of nonconsent by words or conduct at the time of the act. The court's denial appears to be based solely on its belief that because Nelson had no memories of the night she failed to carry her burden to prove nonconsent. The court instead relied only on the testimony of

---

[14] RCW 7.90.090(4)(b) states: "[d]enial of a remedy may not be based, in whole or in part, on evidence that: . . . The petitioner was voluntarily intoxicated."

[15] "Waking up the next morning after a night of drinking and maybe not a memory—I don't know what happened there as to why she didn't testify regarding the specific facts of the case." RP (March 31, 2015) at 88. "Alcohol's not good, especially when you're a good-looking lady running around on campus. So I'm not blaming anybody for this except to tell you that that's another factor in this case that I think was something that is unfortunate." RP (March 31, 2015) at 90.

Duvall. The trial court based its decision on the evidence and did not deny the order because Nelson was voluntarily intoxicated.

III.

Nelson argues that the trial court erred in excluding documents, including the police report, as inadmissible hearsay. While we agree that the trial court erred, the error was harmless.

Hearsay evidence is generally inadmissible under the Washington Rules of Evidence in all actions and proceedings in Washington State courts. ER 1101. However, the Rules of Evidence "need not be applied" in "[p]rotection order proceedings under RCW 7.90." ER 1101(c)(3). Accordingly, "competent evidence sufficient to support the trial court's decision to grant or deny a petition for a . . . protection order may contain hearsay or be wholly documentary." Blackmon v. Blackmon, 155 Wn. App. 715, 722, 230 P.3d 233 (2010); See also Gourley v. Gourley, 158 Wn.2d 460, 467, 145 P.3d 1185 (2006).

In this case, the trial court failed to recognize that SAPOA proceedings fall within an exception to the evidence rules. The trial court uniformly held all of the evidence to the same hearsay rules required at trial without considering whether any of the evidence was "competent evidence sufficient to support the trial court's decision to grant or deny a petition." Blackmon, 155 Wn. App. at 722. We hold the trial court abused its discretion by repeatedly applying the wrong legal standard in determining the admissibility of hearsay, and its decision to completely disregard ER 1101(c)(3) and

apply the rules of evidence across the board is a view "that no reasonable person would take."[16]

However, an evidentiary error will not be reversed absent a showing that the error caused prejudice. Aubin v. Barton, 123 Wn. App. 592, 608, 98 P.3d 126, 134 (2004). Nelson cites error to the trial court's decision to exclude the police report, a corroboration of Nelson's own testimony, but fails to provide any argument as to how the exclusion resulted in prejudice. Nelson also failed to preserve the report for review on appeal, so this court cannot make a determination as to its relevance. While we hold that the trial court abused its discretion in automatically excluding all hearsay evidence, this error was harmless.

IV.

Nelson argues briefly that the court's "[s]ubstantive and procedural decisions raise due process concerns" citing to only one case and failing to cite to the record. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996). We will not consider an inadequately briefed argument. Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011).

---

[16] See In re Dependency of A.L.W., 108 Wn. App. 664, 673, 32 P.3d 297, 301 (2001) (The trial court erred in holding that the letters from the Leech Lake Band and the Minnesota Chippewa Tribe were inadmissible hearsay because the rules of evidence do not apply to dependency review hearings in juvenile court under ER 1101(c)(3)). Here, Nelson's challenge focuses on the trial court's determination that all offered hearsay evidence was inadmissible evidence.

## CONCLUSION

We reverse and remand for further proceedings and the entry of findings. On remand, the trial court is to reconsider the existing record and determine whether Nelson proved by a preponderance of evidence that she lacked the mental capacity to consent at the time of the sexual penetration. If the court finds that Nelson demonstrated a lack of mental capacity to consent at the time of the sexual penetration, the court should enter the requested protection order. If the court finds that Nelson failed to prove that she lacked the mental capacity and failed to prove that sexual penetration was nonconsensual, the court should deny the requested order.

_Mann, J._

WE CONCUR:

_Trickey, A.C.J._                    _Leach, J._