**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILED**
**AUGUST 30, 2022**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CARMELLA DESEAN, | ) | |
| | ) | No. 38552-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ISAIAH SANGER, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Former chapter 7.90 RCW, the Sexual Assault Protection

Order Act (SAPOA),[1] provided a civil protective remedy to victims of sexual assault who

sought to avoid future interaction with their assailant. The petitioner was required to

allege and the court to find that sexual conduct or sexual penetration suffered by the

victim was "nonconsensual." Former RCW 7.90.050, .090. The remedy is now provided

by a civil protection order act codified in chapter 7.105 RCW, which reflects the same

requirements at RCW 7.105.100(1)(b) and .225(1)(b).

---

[1] Legislation passed in 2021 addresses six types of civil protection orders in a single chapter—chapter 7.105 RCW. It generally took effect, and the provisions of former chapter 7.90 RCW were repealed, effective July 1, 2022. LAWS OF 2021, ch. 215, §§ 87, 170.

No. 38552-3-III
*DeSean v. Sanger*

In some cases, a person may feel sure they were the victim of unconsented-to conduct but lack the ability to so testify because they were incapacitated when the conduct occurred. The SAPOA has been construed to implicitly provide that the contact or penetration is nonconsensual if the victim lacks the capacity to consent. *Nelson v. Duvall*, 197 Wn. App. 441, 387 P.3d 1158 (2017). Where there is evidence of excessive alcohol consumption by a petitioner or the petitioner was otherwise impaired, the trial court has an obligation to determine whether the petitioner had the capacity to consent. *Id.* at 444.

Isaiah Sanger appeals a sexual assault protective order (SAPO) obtained against him by Carmella DeSean, challenging procedural rulings by the trial court and the sufficiency of the evidence to support the court's finding that Ms. DeSean lacked the capacity to consent. While the evidence is conceivably sufficient to support the trial court's issuance of a SAPO, the lack of evidentiary support for the court's finding of the amount of alcohol consumed by Ms. DeSean and the court's refusal to consider an affirmative defense require that the trial court consider the evidence anew. We reverse and remand for further proceedings.

FACTS AND PROCEDURAL BACKGROUND

On awakening on the morning of August 8, 2020, Carmella DeSean became concerned that Isaiah Sanger, the roommate of Bailey Duncan, a young man she had traveled to Henderson, Nevada, to visit, might have had sexual intercourse with her the

2

No. 38552-3-III
*DeSean v. Sanger*

night before. She recalled that the night had started with her, Mr. Duncan, and Mr. Sanger having dinner and then drinking margaritas by the pool. After her third drink, Ms. DeSean could only remember a few things: she recalled Mr. Sanger having her take a shower and washing her hair, him taking her to Mr. Duncan's room to get her a shirt and underwear, and her sitting on the floor and telling Mr. Sanger, "No we can't do this because of Bailey." Report of Proceedings (RP) at 8.

On waking on August 8, she noticed bruising on her body, her vagina was bleeding and hurt, and the room where she awoke "smel[led] like condom[s] and sex." Clerk's Papers (CP) at 4. Ms. DeSean questioned Mr. Sanger, whom she claims first told her he did not know what happened but later, having found condoms, said, "'I think we had sex.'" RP at 66. When she approached him again later to ask about what had happened, she claims Mr. Sanger laughed and said he had intercourse with her against the bathroom wall.

Confident she would not have consented to the sexual relations, Ms. DeSean asked Mr. Duncan to take her to a hospital for examination two days later. There, she was examined by a sexual assault nurse examiner and interviewed by Detective Kari Skinner of the Henderson Police Department. After speaking with Ms. DeSean, Detective Skinner also questioned Mr. Duncan at the hospital, but he told the detective he did not know what had happened between Ms. DeSean and Mr. Sanger because he had been intoxicated and had passed out on the sofa. The detective submitted the results of her

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38552-3-III
*DeSean v. Sanger*

investigation to the district attorney's office, which closed the case after concluding that probable cause to charge was lacking.

On August 31, 2020, Ms. DeSean, who had returned home to southeastern Washington, completed and filed a handwritten petition for a SAPO. A temporary SAPO issued ex parte that day.

After being served with the petition and temporary SAPO, Mr. Sanger submitted a 29-page typewritten statement with attachments. The attachments included a redacted incident report from the Henderson Police Department that reflected the decision to close the investigation without charges. In Mr. Sanger's statement, he asserted he and Ms. DeSean had a consensual sexual encounter that began after the two of them came upstairs from the pool. He stated that Ms. DeSean had originally felt ill but threw up and felt better, and the two decided to take a shower. He stated that the two had consensual sex on the bathroom floor and against the bathroom wall. Mr. Sanger also claimed Ms. DeSean suggested having a threesome with Mr. Duncan, and Mr. Sanger went downstairs to ask Mr. Duncan if he wanted to join them. Mr. Duncan was lying on the couch, did not want to come upstairs, and according to Mr. Sanger said, "[H]ave at it." CP at 94.

Mr. Sanger stated that the next morning, Ms. DeSean asked him if they had sex the night before, which worried him because it suggested she might regret what had happened. Describing himself as "panick[ing] a bit," he said, "I don't know, I think we did," and then returned shortly to tell Ms. DeSean that they must have had sex because

4

No. 38552-3-III
*DeSean v. Sanger*

there were two condoms in the garbage. CP at 97. He claimed that later that day, Ms. DeSean agreed with him that what had happened between them was consensual. He admitted, however, that over the next couple of days she became angry and upset.

An initial hearing following issuance of the temporary SAPO took place before a court commissioner. Both parties appeared, neither represented by counsel. The commissioner heard testimony from Ms. DeSean but then continued the hearing upon realizing that Mr. Sanger had filed his 29-page submission the prior day, which the commissioner had not had the opportunity to review.

Both parties thereafter retained lawyers and a full evidentiary hearing was requested. After two continuances and extensions of the ex parte order, the matter proceeded to a full evidentiary hearing.

By the time of the hearing, the evidence that had been submitted by Ms. DeSean consisted of her handwritten petition, a declaration from Ms. DeSean submitted by her lawyer, and declarations from two of Ms. DeSean's female friends and Mr. Duncan. The evidence submitted by Mr. Sanger consisted of his original 29-page statement with the redacted incident report, a transcript of the original hearing, and a declaration from Mr. Sanger submitted by his lawyer. Collectively, the evidence addressed the events of the evening of August 7, the alcoholic drinks Ms. DeSean had consumed and her level of intoxication, Ms. DeSean's reported flashbacks of events that transpired between her and Mr. Sanger that night, what was going on with Mr. Duncan downstairs, and Ms.

No. 38552-3-III
*DeSean v. Sanger*

DeSean's, Mr. Sanger's, and Mr. Duncan's communications over the next several days about what had taken place.

Live evidence presented at the hearing consisted of testimony from Mr. Duncan, whom Ms. DeSean called as a witness, testimony from Detective Skinner, whom Mr. Sanger called as a witness, and testimony from the parties themselves.

At the beginning of the hearing, Ms. DeSean's lawyer stated her understanding that there was no cross-examination of the parties. Asked for Mr. Sanger's position, his lawyer answered, "I will defer to what the Court prefers. I think the Court has a great deal of discretion in terms of how to conduct these hearings." RP at 28. The judge stated that typically, cross-examination of parties was not allowed, so that is how they would proceed. After Ms. DeSean testified, however, Mr. Sanger's lawyer requested cross-examination, ultimately explaining that "Ms. DeSean has said quite a few things that she didn't say before." RP at 71. The court stated it would allow cross-examination only into matters that were newly raised in Ms. DeSean's testimony. Defense counsel was permitted to question Ms. DeSean about the fact that she had sex with Mr. Duncan before returning to the northwest and could have visited the hospital a day earlier, but went sightseeing that day instead. When defense counsel began to inquire about the remainder of Ms. DeSean's stay in Henderson, the trial court sustained an objection to exceeding the scope of direct and added that the evidence was also irrelevant. Defense counsel did not object and asked no further questions.

6

No. 38552-3-III
*DeSean v. Sanger*

At the conclusion of the evidence and argument, the trial judge took the matter under advisement and issued a written decision a few days later. The decision did not address many of the factual disputes about what had transpired on August 7 and the days that followed, because the trial judge found dispositive that sexual penetration was undisputed and Ms. DeSean lacked the capacity to consent to sexual contact or sexual penetration due to her high level of intoxication. Mr. Sanger moved for reconsideration, which was denied. He appeals.

### ANALYSIS

Mr. Sanger makes eight assignments of error, which we reorganize and address as four. Mr. Sanger fails to demonstrate that the evidence is insufficient to support the trial court's entry of a SAPO. He does not demonstrate that he was denied due process by a limitation on his cross-examination. He does demonstrate that the trial court erred by refusing to consider his affirmative defense that he reasonably believed Ms. DeSean had the capacity to consent. He also demonstrates that substantial evidence does not support the trial court's material factual finding about how much alcohol was in the first two mixed drinks consumed by Ms. DeSean on August 7. The two errors require that we reverse the SAPO and remand for further proceedings.[2]

---

[2] Two of Mr. Sanger's assigned errors, his second and sixth, are not developed by his briefing and will not be reviewed. *See* Appellant's Br. at 1 (assigning error to denial of reconsideration and to the trial court's finding that Ms. DeSean said "no" three times). RAP 10.3(a)(6); *State v. Dennison*, 115 Wn.2d 609, 629, 801 P.2d 193 (1990).

7

No. 38552-3-III
*DeSean v. Sanger*

I.      MR. SANGER FAILS TO DEMONSTRATE THAT THE EVIDENCE IS INSUFFICIENT TO
        SUPPORT THE TRIAL COURT'S ENTRY OF A SAPO

Two of Mr. Sanger's assignments of error and a portion of his opening brief

advance the argument that the evidence presented by Ms. DeSean was insufficient to

support the trial court's conclusion that Ms. DeSean was sexually penetrated by Mr.

Sanger at a time when she lacked the capacity to consent.

Where the trial court has weighed the evidence, we review whether its findings are

supported by substantial evidence and whether those findings support the conclusions of

law. *State v. Coleman*, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018) (citing *State v.

Klein*, 156 Wn.2d 102, 115, 124 P.3d 644 (2005)).  Substantial evidence exists where

there is sufficient evidence in the record to persuade a rational, fair-minded person of the

truth of the finding.  *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 353, 172 P.3d 688

(2007).  We defer to the trial court on the persuasiveness of evidence, witness credibility,

and conflicting testimony.  *In re Vulnerable Adult Pet. for Knight*, 178 Wn. App. 929,

937, 317 P.3d 1068 (2014).  Unchallenged findings of fact are verities on appeal.  *In re

Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004); RAP 10.3(g).

In support of its conclusion, the court identified four categories of evidence on

which it relied, within which it identified discrete pieces of evidence.  Ms. DeSean does

not challenge the following facts found by the trial court, which are verities.  The court's

first category included findings that Mr. Sanger prepared a third drink for Ms. DeSean,

8

No. 38552-3-III
*DeSean v. Sanger*

total amount of alcohol unknown, and that she was asked to "chug" it; that when the parties left the pool area, Mr. Duncan observed Ms. DeSean stumbling, requiring assistance walking, crying, vomiting and dry heaving; later, when Mr. Duncan went upstairs to check on her, she was mumbling and not responding appropriately to his attempts to wake her; he described her as "incoherent"; finally, Mr. Duncan testified that Ms. DeSean's knees were bruised the next day and that she was nauseous. CP at 122. Ms. DeSean testified herself that she was intoxicated. Mr. Sanger testified that the three were "all highly intoxicated." *Id.*

The court's second category of findings included that Ms. DeSean's memories of what happened after she went into the house that evening consist of "flashbacks" of sitting on the bathroom floor, being in the shower with Mr. Sanger, and saying "no" three times. *Id.*

Its third category of findings included that Ms. DeSean's friend Gabriella Bloom communicated with her the evening of August 7 via Snapchat; she saw pictures of Ms. Desean with glossy heavy eyes, knew she had been drinking, was aware that she did not feel well, and Ms. DeSean stopped communicating early in the evening.

As Mr. Sanger points out, the court in *Nelson* rejected the proposition that incapacity caused by alcohol consumption renders a victim incapable of consent as a matter of law. 197 Wn. App. at 456. *Nelson* held that where there is some evidence of incapacity to consent, "[t]he court must consider whether a 'condition existing at the time

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38552-3-III
*DeSean v. Sanger*

of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse, whether that condition is produced by illness, defect, the influence of a substance or from some other cause.'" *Id.* at 457 (quoting RCW 9A.44.010(4)). Mr. Sanger argues there *was* evidence that Ms. DeSean was aware and understood the nature and consequences of his and her sexual relations. He points to the statements in her petition that she remembered telling him "no" at one point because of Bailey, and him telling her "'if I get you pregna[nt] I will be the father and marry you.'" CP at 4. Mr. Sanger also points to his testimony that Ms. DeSean insisted that he use condoms and that she initiated the sexual activity. But Ms. DeSean rejected the suggestion that she did or would have initiated sexual activity or asked that Mr. Sanger use condoms. And the trial court's ruling discounted Mr. Sanger's credibility. It found that he told Mr. Duncan in a text message on August 8 that he could not remember "much," only "bits and pieces" of what happened, and it was only later, in September and October, that Mr. Sanger provided 29 pages of details. CP at 122.

Mr. Sanger also argues that the trial court should not have relied on Ms. DeSean's testimony that she could not recall what happened, because lack of memory following alcohol consumption does not mean that one is not awake and consenting. A significant lack of memory is not without any evidentiary value, however. *Cf. State v. Thomas*, 123 Wn. App. 771, 782, 98 P.3d 1258 (2004) ("The effects of alcohol are commonly known and jurors can draw reasonable inferences from testimony about alcohol use." (citing

10

No. 38552-3-III
*DeSean v. Sanger*

*State v. Kruger*, 116 Wn. App. 685, 692-93, 67 P.3d 1147 (2003); *State v. Smissaert*, 41 Wn. App. 813, 815, 706 P.2d 647 (1985))).  Ms. DeSean was able to point to other evidence from which a fact finder could find it probable that she was intoxicated to the point of incapacity; perhaps most important was Mr. Duncan's testimony that he went upstairs and found Ms. DeSean to be unresponsive and incoherent near the time the sexual penetration took place.

Mr. Sanger fails to demonstrate that there is insufficient evidence to support a SAPO.

II.      MR. SANGER DID NOT PRESERVE THE OBJECTION TO LIMITS ON CROSS-
         EXAMINATION THAT HE RAISES ON APPEAL

Former chapter 7.90 RCW did not provide that parties to a full evidentiary hearing have a right to call witnesses or engage in cross-examination.  Notwithstanding the statutory silence, "'Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment'" to the United States Constitution.  *Nguyen v. Dep't of Health*, 144 Wn.2d 516, 522-23, 29 P.3d 689 (2001) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)), *cert. denied*, 535 U.S. 904, 122 S. Ct. 1203, 152 L. Ed. 2d 141 (2002).  In determining what process is due, a court weighs (1) the private interest affected by the official action, (2) the risk of an erroneous deprivation of that interest through the

11

No. 38552-3-III
*DeSean v. Sanger*

procedures used, (3) the probable value of additional procedural safeguards, and (4) the

government interest involved. *Mathews*, 424 U.S. at 335.

In the context of domestic violence protection order hearings, a six-judge majority

of our Supreme Court agreed in *Gourley v. Gourley*, 158 Wn.2d 460, 468-69, 145 P.3d

1185 (2006) (plurality opinion), that due process may require cross-examination,

although it held in that case that a respondent who sought to cross-examine his 14-year-

old daughter about accusing him of sexual assault had not shown it was necessary in his

case. *Aiken v. Aiken*, 187 Wn.2d 491, 498, 387 P.3d 680 (2017) (describing the plurality

and concurring decisions in *Gourley*). The court held that while relevant statutes did not

require a trial judge to allow live testimony or cross-examination in every protective

order proceeding, whether live testimony or cross-examination is required "will turn on

the *Mathews* balancing test." *Id.* at 499. It also held that "[a] bright line rule prohibiting

cross-examination or live testimony in protective order hearings is inappropriate, as it is

the province of the trial judge or commissioner to grant or deny cross-examination based

on individualized inquiries into the facts of the instant case." *Id.* at 505-06.

We conclude it is also inappropriate for the superior court to have a practice that

typically cross-examination of parties is not allowed. In this case, however, we find that

Mr. Sanger's challenge to the limitation of cross-examination fails for a reason unrelated

to his right to due process: defense counsel did not object to the limitations imposed by

No. 38552-3-III
*DeSean v. Sanger*

the trial court.  The due process objection raised on appeal was not raised in the trial court.

At the outset of the hearing, the trial court asked defense counsel her position on cross-examination and counsel deferred to the trial court, expressing belief that the court had a "great deal of discretion."  RP at 28.  After Ms. DeSean testified, defense counsel requested cross-examination, arguing in support that "Ms. DeSean has said quite a few things that she didn't say before," and asking for the opportunity to "speak with her somewhat."  RP at 71.  Defense counsel accepted the court's ruling that it would allow cross-examination into only matters that were newly raised in Ms. DeSean's live testimony.  *Id.*  This is consistent with ER 611(b).  Defense counsel did not ask for the opportunity to call Ms. DeSean as a witness in the defense case.  When the trial court perceived defense counsel to exceed the scope of the direct examination and sustained an objection, defense counsel stated, "Okay.  No more questions," and thanked the court. RP at 75.

The general rule is that appellate courts will not consider issues raised for the first time on appeal.  RAP 2.5(a); *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).  An objection that Mr. Sanger had a due process right to a broader cross-examination of Ms. DeSean was not preserved.

13

No. 38552-3-III
*DeSean v. Sanger*

III.      FOLLOWING *NELSON V. DUVALL*, THE TRIAL COURT SHOULD HAVE CONSIDERED MR. SANGER'S AFFIRMATIVE DEFENSE

Under former RCW 7.90.010(2) and .090, a trial court issued a SAPO upon a finding by a preponderance of the evidence that a petitioner had been a victim of nonconsensual sexual contact or nonconsensual sexual penetration, with "nonconsensual" meaning a "lack of freely given agreement." The statute did not provide that a SAPO should issue if sexual contact or sexual penetration took place when the complaining petitioner lacked the capacity to consent. In *Nelson*, however, this court construed the SAPOA to implicitly require that the petitioner have the capacity to consent. 197 Wn. App. at 456. In arriving at this conclusion, this court observed that a legislative statement of intent can be "'crucial to interpretation of a statute,'" *id.* at 453 (quoting *Towle v. Dep't of Fish & Wildlife*, 94 Wn. App. 196, 207, 971 P.2d 591 (1999)), and reviewed the legislature's declaration in creating the SAPO remedy:

> *Sexual assault* is the most heinous *crime* against another person short of murder. *Sexual assault* inflicts humiliation, degradation, and terror on *victims*. According to the FBI, a woman is *raped* every six minutes in the United States. *Rape* is recognized as the most underreported *crime*; estimates suggest that only one in seven *rapes* is reported to authorities. *Victims* who do not report the *crime* still desire safety and protection from future interactions with the *offender*. Some cases in which the *rape* is reported are not prosecuted. In these situations, the *victim* should be able to seek a civil remedy requiring that the *offender* stay away from the *victim*. It is the intent of the legislature that the *sexual assault* protection order created by this chapter be a remedy for *victims* who do not qualify for a domestic violence order of protection.

Former RCW 7.90.005 (emphasis added).

14

No. 38552-3-III
*DeSean v. Sanger*

Because the SAPOA "is focused on sexual assault and rape," *Nelson* held, "its terms should be read in harmony with the 'sex offenses' chapter of the Washington Criminal Code, chapter 9A.44 RCW." 197 Wn. App. at 454. And "[u]nder the criminal code, a person is guilty of rape in the second degree when he or she engages in sexual intercourse with another person '[w]hen the victim is incapable of consent by reason of being physically helpless or mentally incapacitated.'" *Id.* at 455 (alteration in original) (quoting RCW 9A.44.050(1)(b)). Concluding that the SAPOA "was intended to provide a civil protective remedy to all rape victims recognized under criminal law, without exclusion," this court held that when deciding whether to grant a SAPO, the trial court is required to consider evidence that the victim lacked the mental capacity to consent. *Id.* at 456.

Relying on *Nelson*, Mr. Sanger argued at the hearing and in moving for reconsideration that the trial court must bear in mind that a rape is not committed where the victim is physically helpless or mentally incapacitated if the defendant

> prove[s] by a preponderance of the evidence that at the time of the offense the defendant reasonably believed that the victim was *not* mentally incapacitated and/or physically helpless.

RCW 9A.44.030(1) (emphasis added). The trial court refused to consider the affirmative defense in its original decision or on reconsideration, however, reasoning that "neither RCW 7.90 or *Nelson* mention affirmative defenses." CP at 178.

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38552-3-III
*DeSean v. Sanger*

Former chapter 7.90 RCW does not mention the affirmative defense, but it also does not say that a petitioner who lacks the mental capacity to consent may obtain a SAPO. It was this court's decision in *Nelson* that interpreted the SAPOA to provide a civil remedy for all criminal sexual assaults. The affirmative defense is relevant because where it is proved, there *is* no criminal sexual assault.

Ms. DeSean defends the trial court's refusal to consider the affirmative defense on appeal, arguing that the "point of a civil case" is "much different" from a criminal case; it is "to address the petitioner's harm." Br. of Resp't at 20. She also argues, "[I]f the legislature intended for the criminal code's affirmative defense to apply . . . then it would have been reflected in the statute's plain language." *Id.*

If the plain language of former chapter 7.90 RCW addressed incapacity as a basis for obtaining a SAPO, we agree that one would expect the affirmative defense to be addressed as well. But the chapter said nothing about incapacity, so there was no reason to address the affirmative defense. In an analogous context, a protective order is *not* available against a respondent who unwittingly takes advantage of a nonconsenting party. *See* RCW 7.105.010(13)(c) (defining "financial exploitation" to include obtaining or using a vulnerable adult's property without lawful authority, but only "by a person or entity who *knows or clearly should know that the vulnerable adult lacks the capacity to consent* to the release or use of the vulnerable adult's property" (emphasis added)). Since it was this court, in *Nelson*, which implied that criminal sexual assaults based on a

16

No. 38552-3-III
*DeSean v. Sanger*

victim's lack of capacity are a basis for the civil SAPO remedy, we must look to *Nelson*'s

reasoning to determine if the affirmative defense should apply. And given *Nelson*'s

reasoning—that the SAPOA "was intended to provide a civil protective remedy to all

rape victims recognized under criminal law," 197 Wn. App. at 456,—the affirmative

defense should apply.

As for Ms. DeSean's argument that the purpose of the civil remedy is not to

punish the respondent but to address the petitioner's harm, it is crucial to focus on the

narrow context that is at issue: we are talking about a defendant who has proved by the

required burden of proof that he reasonably believed the victim was not mentally

incapacitated or physically helpless. The legislature's statement of purpose, which was

clearly all about criminal sexual assault and rape, does not suggest the legislature

intended to impose the stigma of a SAPO on a person who reasonably believed they were

engaged in consensual conduct with a partner who had the capacity to consent.

Following *Nelson*, the trial court should have considered Mr. Sanger's affirmative

defense.

IV.    THE RECORD DOES NOT SUPPORT THE TRIAL COURT'S FINDING OF FACT ABOUT THE
       AMOUNT OF ALCOHOL CONSUMED, WHICH IS MATERIAL

Finally, Mr. Sanger assigns error to the trial court's finding that "Bailey Duncan

prepared the first two drinks which contained 8 ounces of tequila in a 20 oz. glass." CP

at 121. The finding is clearly erroneous. The evidence on which the court necessarily

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38552-3-III
*DeSean v. Sanger*

relied was Mr. Duncan's testimony about how much liquor he poured when he made Ms. DeSean's first two drinks; his was the only testimony that addressed a measure of the amount. He estimated that in each case, he poured in "an eighth of a twenty-ounce glass, maybe less" of tequila, which would equate to 2.5 ounces of tequila, or less, in each drink. RP at 34. Since the trial court's finding refers to the amount of tequila "in a 20 oz. glass," the court evidently believed there were 8 ounces of tequila in each of Ms. DeSean's first two drinks. CP at 121.

This is an extraordinary amount of alcohol and more than three times the amount testified to by Mr. Duncan. As argued by Mr. Sanger, at Ms. DeSean's weight as testified to at trial, the 16 ounces of liquor would result in a fully absorbed blood alcohol content of about .40 without allowing for burn-off. *See* Appellant's Reply Br. at 5 n.2. And this is before Ms. DeSean even began to consume her third drink.

Immaterial findings that do not affect a trial court's conclusions of law are not prejudicial and do not warrant reversal. *Coleman*, 6 Wn. App. 2d at 516 (citing *Cowiche Canyon v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992)). But this evidence is material. It is true that the trial court made other findings that could support its conclusion that Ms. DeSean lacked the capacity to consent. But a finding that the first two drinks consumed by Ms. DeSean collectively contained a pint of hard liquor is such compelling evidence of excessive alcohol consumption that it could have been heavily weighted and even colored the court's perception of other evidence.

18

No. 38552-3-III
*DeSean v. Sanger*


We reverse the SAPO and remand for further proceedings consistent with this

opinion.

_____
Siddoway, C.J.

WE CONCUR:


_____
Fearing, J.


_____
Lawrence-Berrey, J.