FILED
3/22/2021
Court of Appeals
Division I
State of Washington

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| NATASHA MARIE POWELL, | DIVISION ONE |
| Appellant, | No. 81237-8-I |
| v. | UNPUBLISHED OPINION |
| THOMASZ MARK FRACZEK, | |
| Respondent. | |

DWYER, J. — Natasha Powell appeals from the superior court's order denying her petition for a domestic violence protection order. Powell and amici raise numerous arguments on appeal. These include allegations that the superior court erred by (1) not making certain findings of fact that Powell claims were supported by substantial evidence, (2) misapplying Washington law regarding the requirements for when a domestic violence protection order shall issue, (3) failing to make a finding as to whether Powell had the capacity to consent, (4) considering evidence in violation of Washington's "rape shield" laws, (5) basing its decision on text messages that were unauthenticated, and (6) considering text messages that merely served to humiliate and embarrass Powell, denying her meaningful access to justice. Because Powell does not establish an entitlement to relief on any of these claims, we affirm.

I

Natasha Powell and Thomasz Fraczek were graduate students at the University of Washington. On April 3, 2019, Powell initiated a Title IX[1] complaint through the university, alleging that Fraczek had sexually assaulted her on March 17, 2019. In an initial order dated June 17, 2019, a Title IX investigator concluded that Fraczek did not sexually assault Powell. Powell requested administrative review of the initial order and, on July 29, a Title IX panel affirmed the order.

On September 23, 2019, Powell filed a petition for a domestic violence protection order in the King County Superior Court. In the petition, Powell alleged that Fraczek sexually assaulted her on three separate occasions. Powell also requested a temporary order of protection to remain in effect until a hearing was held on her petition. A court commissioner granted Powell's ex parte request for a temporary order of protection. On October 21, a court commissioner conducted an adversarial hearing on the matter and granted Powell's petition for an order of protection. The order stated that it would remain in effect "for at least" four years. Fraczek subsequently filed a motion for revision.

On January 16, 2020, the superior court heard the motion for revision. During the hearing, the superior court found that Fraczek had neither sexually assaulted Powell nor inflicted upon Powell a fear of imminent physical harm. The court's oral ruling was followed by the entry of three separate written orders that

---

[1] See 20 U.S.C. §§ 1681-1688.

(1) granted Fraczek's motion for revision, (2) rescinded the domestic violence protection order that was entered by the commissioner, and (3) denied Powell's petition for a domestic violence protection order. On January 27, Powell filed a motion for reconsideration. The superior court denied this motion.

Powell appeals.

II

A

Where, as here, "the superior court makes a decision on revision, 'the appeal is from the superior court's decision, not the commissioner's.'" State v. Ramer, 151 Wn.2d 106, 113, 86 P.3d 132 (2004) (quoting State v. Hoffman, 115 Wn. App. 91, 101, 60 P.3d 1261 (2003)).

Chapter 26.50 RCW authorizes the issuance of a protection order if the party seeking it alleges "the existence of domestic violence, and . . . [declares] the specific facts and circumstances from which relief is sought." RCW 26.50.030(1). Domestic violence is defined, in relevant part, as "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, sexual assault, or stalking . . . of one intimate partner by another intimate partner." RCW 26.50.010(3). Because an order of protection is a civil remedy, the petitioner must establish its propriety by a preponderance of the evidence.[2]

---

[2] See Reese v. Stroh, 128 Wn.2d 300, 312, 907 P.2d 282 (1995) (stating that, in civil cases, the burden of proof is a preponderance of the evidence); City of Tacoma v. State, 117 Wn.2d 348, 351-52, 816 P.2d 7 (1991) (stating that chapter 26.50 RCW "created a civil remedy in the form of a protection order").

The superior court's "decision to grant or deny a domestic violence protection order is reviewed for an abuse of discretion." Maldonado v. Maldonado, 197 Wn. App. 779, 789, 391 P.3d 546 (2017). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

When a superior court makes findings of fact, those findings are "verities on appeal" when they are "supported by substantial evidence." Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 819, 828 P.2d 549 (1992). "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978). "Where written findings of fact are incomplete, we may rely on the trial court's oral findings for purposes of review." State v. Robertson, 88 Wn. App. 836, 843, 947 P.2d 765 (1997).

Moreover, "[w]here there is conflicting evidence, it is not the role of the appellate court to weigh and evaluate the evidence." Burnside v. Simpson Paper Co., 66 Wn. App. 510, 526, 832 P.2d 537 (1992), aff'd, 123 Wn.2d 93, 864 P.2d 937 (1994). Rather, our "role is simply to determine whether substantial evidence supports the findings of fact and, if so, 'whether the findings in turn support the trial court's conclusions of law.'" Greene v. Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999) (quoting Org. to Preserve Agric. Lands v. Adams County, 128 Wn.2d 869, 882, 913 P.2d 793 (1996)). Moreover, "[q]uestions of credibility are left to the trier of fact and will not be overturned on appeal." State

v. Boot, 89 Wn. App. 780, 791, 950 P.2d 964 (1998). "Although the trier of fact is free to believe or disbelieve any evidence presented at trial, '[a]ppellate courts do not hear or weigh evidence, find facts, or substitute their opinions for those of the trier-of-fact.'" Yorkston v. Whatcom County, 11 Wn. App. 2d 815, 831, 461 P.3d 392 (alteration in original) (quoting Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009)), review denied, 195 Wn.2d 1020 (2020). In conducting our review, we view the evidence in the light most favorable to the prevailing party. Scott's Excavating Vancouver, LLC v. Winlock Props., LLC, 176 Wn. App. 335, 342, 308 P.3d 791 (2013).

B

The predicate of Powell's petition for a domestic violence protection order was that Fraczek engaged in one or more acts of domestic violence. Specifically, Powell alleged that Fraczek sexually assaulted her on three separate occasions: first on October 20, 2018, then on January 11, 2019, and again on March 17, 2019. Additionally, Powell's declaration asserted that Fraczek "has demonstrated a lack of boundaries that leaves me fearful for what he will do next. I am afraid for my life every time I am anywhere near the University of Washington."

By a written order entered on January 16, 2020, the superior court denied Powell's petition, concluding that "[a] preponderance of the evidence has not established that there is domestic violence." This conclusion of law was supported by the superior court's findings of fact, which were entered following

the hearing on Fraczek's motion for revision. In particular, the superior court

found that Fraczek did not sexually assault Powell:

> I do not find that there was a sexual assault. I think that there was consent. The two of you certainly did some drinking together. Maybe you had more than he did. But the declarations that I reviewed from folks that were with you, up to the point where you were alone together and being intimate, do not support the issuance of a protection order.

Furthermore, the superior court found that Fraczek did not inflict on Powell

a fear of imminent physical harm:

> I do not find that your fear of . . . Mr. Fraczek is one that is based upon a rational belief that he is going -- that you are in fear of imminent physical harm. What I see is a man that probably does not want to have contact with you. . . . I do not believe that he has any interest in having anything, frankly, to do with you.

Because these findings of fact are supported by substantial evidence, we

consider them to be verities on appeal.[3]

C

The superior court's finding that Fraczek did not sexually assault Powell

on October 20, 2018, is supported by substantial evidence. On that day, Fraczek

and Powell attended a football game together at the University of Washington.

Before the game started, Fraczek and Powell purchased "a pack of Coors" and

drank "some of the beers." After the game ended, Fraczek, Powell, and two

other individuals—Remy Margerum and Emily Brown—went to a bar to get food

and drinks.

---

[3] Because Domestic Violence Protection Act petitions commence a "special proceeding," Scheib v. Crosby, 160 Wn. App. 345, 351-52, 249 P.3d 184 (2011), strict compliance with the CR 52 mandate concerning the entry and content of the findings of fact is not required. CR 81(a).

Fraczek's declaration provided that, while the four were having dinner, Powell put "her hand between [Fraczek's] legs and had rubbed [his] penis till [he] was hard." The group then went to another bar where they consumed more alcohol. At that bar, Powell "touch[ed] [Fraczek] under the table." The group ultimately decided to go to a different bar to dance. While there, Powell and Fraczek "ma[de] out passionately."

According to Fraczek, Powell told him "that she wanted Emily, Remy and [Fraczek] to all come back to her place so [they] could have a foursome." Powell "claimed Emily had suggested the idea and she said she was super into it." The group went to Powell's house where Remy and Brown "ma[de] out" and Powell and Fraczek "ma[de] out."

Powell and Fraczek subsequently went into Powell's bedroom. According to Margerum, Powell "appear[ed] to go willingly." Fraczek recollected that, once they were inside Powell's bedroom, they started "making out, fondling, and giving oral." Additionally, Powell "kept saying things like 'oh god I want to fuck you' and ask[ed] [Fraczek] to see if Remy or Emily had a condom." Fraczek exited the bedroom and asked Margerum and Brown whether either of them had a condom. Neither Brown nor Margerum had a condom. Then, according to Fraczek, he and Powell "ended up having unprotected sex" and he "tr[ied] to pull out only to have her grab [him] with both her legs and arms and pull [him] in."

After Fraczek and Powell woke up the next day, they "lay[ed] around in bed for a while." Fraczek eventually left Powell's house and, around noon, went to a pho restaurant with Margerum. Around 3:30 p.m., Powell sent a text

7

message to Fraczek, inviting him to study at a coffee shop.  Powell then sent two text messages to Fraczek that stated, "Dude this is so off topic but do you think you can get like hungover or have to come down from sex? Lol" and "Because I'm like sad and just want more sex now hahaha fuck my life."

In her petition for a domestic violence protection order, Powell alleged that, on October 20, 2018, Fraczek engaged in sexual intercourse with her and that she, as a result of consuming alcohol, did not recall having sex.

However, in light of the evidence summarized above, a fair-minded person could be persuaded that Fraczek did not sexually assault Powell on October 20, 2018.  Indeed, the text messages sent by Powell to Fraczek suggest that Powell both remembered and consented to having sexual intercourse with Fraczek.  Moreover, according to Margerum, Powell appeared to willingly enter her bedroom with Fraczek.  Once in the bedroom, Fraczek recalled Powell saying that she wanted "to fuck" him and asked that he see if either Margerum or Brown had a condom.  Thus, the superior court's finding that Powell consented to engaging in sexual intercourse with Fraczek on this date is supported by substantial evidence.

D

Substantial evidence also supports the superior court's finding that Fraczek did not sexually assault Powell on January 11, 2019.  On that day, Powell and Fraczek got drinks and dinner with other students from their graduate program.  Afterward, Powell and Fraczek went back to Fraczek's apartment.  Fraczek's roommates, Vineeth Sai Narajala and Soham Ghose, were also at the

8

apartment playing a video game.  In a declaration, Narajala described the night as follows:

> 4.     On the evening in question Tomek[4] and Natasha were with Soham and me for the first part of the evening.  We were playing Mortal Kombat.  One of the game characters is a buxom character named Sonya, who was wearing a suggestive vest.  The body parts in the game are very realistic, which is a recent advent from the software.
> 5.     Natasha and Tomek watched the game for about an hour.  People were enjoying themselves and Natasha said that a vest would look good [on her].  Tomek said, "I have a vest" and Natasha replied, "Let's see it."  She was enthusiastic and the two quickly departed for Tomek's bedroom.

According to Fraczek, once he and Powell entered his bedroom, he "showed her the vest [and] she told [him] to take off [his] shirt."  Then, they "quickly ended up making out on [Fraczek's] bed, with [Powell] sitting on top of [Fraczek]."  Powell then started crying "about her old ex-boyfriend . . . , about how her dad didn't love her and had left her mom because she was a bad child, about how she was a failure because she hadn't invented a cure for cancer which her first college professor had died of."  After some time, Powell exited the bedroom and went to the restroom.

Narajala recalled seeing Powell attend to the restroom:

> 6.     At some point afterwards, I saw Natasha cross the hall to the bathroom, partially clad.  She seemed fine.  I saw no signs of distress nor had I heard any coming from the bedroom.  None of us had any drinks and I saw no signs that Natasha was drunk.  She was not unsteady and did not slur her words.

Powell then returned to the bedroom.  Fraczek recollected that she "tackled [him] down onto the bed and kissed [him]."  Fraczek "said that [he]

---

[4] A variation of Fraczek's first name is Tomek.

9

was . . . shocked at how quickly she had switched from crying about her ex and dead professor to being aggressively sexual with [him]. She countered with 'yeah, nick[5] has told me that before, I guess the endorphins make me really horny.'" They then engaged in sexual intercourse. According to Narajala:

> 7. I also remember hearing the two have sex through the walls of my adjacent room, which shares a wall, on another occasion or occasions. I heard moaning and the bed moving.
> . . . .
> 10. I am stunned that Natasha apparently claims that she blacked out and that she was raped on January [11]. This claim simply does not fit with their interaction and everything that I observed that evening. She was not unsteady or halting; she was alert and an active participant in the game. She was excited to go try on the "vest."

Ghose's recollection of the evening corresponded with Narajala's:

> 5. I am shocked that Natasha claims that she blacked out and that she was raped. She was not unsteady or halting; she was alert and was an active and enthusiastic participant in the game. Additionally, none of us had anything to drink during the time we played the game, and I do not believe Tomek ever had drinks in his room.

The next day, on January 12, Powell sent a text message to Fraczek around noon saying, "I'm sorry I was a mess  Not sure why I was crying that hard or what started it tbh." Fraczek replied, "Yeah, I don't really remember how that happened. One sec you were on top of me, and about to put the vest on, and the next you were on the floor."

Additionally, on January 14, Powell exchanged several text messages with Fraczek that referenced the video game that she, Fraczek, Narajala, and Ghose

---

[5] "Nick" was the name of an individual with whom Powell was previously involved in a relationship.

had been playing on the night that she alleged to have been sexually assaulted. In particular, Powell texted Fraczek, "Wait why are you up?" Fraczek replied, "We got high and ended up fighting the stripper chick." Powell responded, "Hahaha that's such a great sentence" followed by "The chick with boobs that don't obey the laws of physics?" Powell subsequently sent a text message that stated, "Yeah, we've kinda been getting our asse[s] handed to us." Powell replied, "Lowkey that seemed to be the trend when I was watching you p."

In her petition for a domestic violence protection order, Powell alleged that, on January 11, 2019, Fraczek engaged in sexual intercourse with her and that she, as a result of consuming alcohol, had no recollection of having sex.

However, given the evidence summarized above, a fair-minded person could be persuaded that Fraczek did not sexually assault Powell on January 11, 2019. The text messages sent by Powell to Fraczek indicate that Powell had a recollection of the events that occurred on the night in question. Although Powell and Fraczek consumed alcohol prior to arriving at the apartment, the declarations filed by Narajala and Ghose averred that they did not see Powell consume any alcohol while she was at the apartment. Narajala's declaration also provided that Powell and Fraczek "watched the game for about an hour." Furthermore, according to Fraczek, Powell "tackled" him onto his bed upon returning from the restroom before kissing him and engaging in sexual intercourse. Accordingly, the superior court's finding that Powell consented to having sexual intercourse with Fraczek on this date is supported by substantial evidence.

E

Substantial evidence also supports the superior court's finding that Fraczek did not sexually assault Powell on March 17, 2019. On that day, Powell and Fraczek met at a karaoke bar (named "Encore Karaoke") along with other members of their graduate program. According to Fraczek, while they were at the karaoke bar, Powell "pushed [him] up against the wall and kissed [him]." At 8:40 p.m., Fraczek sent a text message to Powell which stated, "Where did y'all go?" Powell responded, "To do shots and get cigs" and "Get drunk with us." Approximately 30 minutes later, Powell sent Fraczek two text messages, which stated, "You wanna do me don't you?" and "I'm sorry I'm drunk." Fraczek replied, "How could you tell? Haha."

After leaving the karaoke bar, the group went to another bar nearby "to have shots." Fraczek recalled that, while they were at the other bar, Powell

> stood leaning up against the barstool [that he] was sitting on and was soon in [his] lap. [He] caressed her leg, to which she pressed herself even more into [him]. After a bit of this, she however loudly exclaimed "don't touch me hoe". [He] . . . immediately removed [his] hands.

Another member of the graduate program, Nastacia Goodwin, witnessed this event. Her statement was summarized by the Title IX investigator as follows:

> Nastacia arrived at Encore at about 6 pm. Tomek was there at the same time. Natasha repeatedly commented that Tomek is wearing his hair down and "he knows what that does to me." Natasha was getting increasingly angry at Tomek because he said she was "bad on the mountain" referring to her climbing skills. Natasha repeatedly said that Tomek wanted to "fuck" her.

> After Karaoke, the group went next door to Earl's, a bar. Natasha sat on Tomek's lap. His hands were on the outside of her thighs which stabilized the bar stool. Natasha said to Tomek "Don't

12

fucking touch me." Tomek looked surprised by . . . Natasha's reaction. Nastacia told Natasha if she did not want Tomek to touch her perhaps she should sit on a stool he was not occupying. Natasha said "it's my fucking stool. I sit where I want to."[6]

According to Fraczek, around midnight he "made the comment that [he] was ready to head home." Powell "decided to walk home with [him] since she had parked her car in front of [his] house." Fraczek told Powell that he "would prefer if she did not drive in her current state and that [he] was happy to get her an uber." Powell declined his offer. Fraczek then "asked if she wanted to come upstairs and watch a movie."

Fraczek then "put on [a] movie, [Powell] sat down next to [him], and [they] started] making out on the couch." After some time, "Natasha said to [Fraczek] 'what are we still doing out here, I want you to fuck me.'" Fraczek then went to his bedroom where Powell "was already on the bed and not wearing pants" and "told [him] to close the door and 'come here already.'" Fraczek "suggested that [he] wanted to eat Natasha out" and, according to Fraczek, Powell "was initially shy and hesitant, [but] when [he] insisted that it was something [he] enjoyed doing, she relented." They proceeded to have sex multiple times.

Because Fraczek did not use a condom during one of the times that they had sex, he and Powell went to a pharmacy to get a "Plan B pill." After going to the pharmacy, Powell "dropped [Fraczek] off at [his] house." Shortly after 3:00 a.m., Powell sent Fraczek a text message, which stated, "Dude I'm really

---

[6] The records wherein this statement is contained were filed in the superior court as sealed reports. In determining Powell's allegations of domestic violence, the superior court explained that it "review[ed] the Title IX investigation." By asserting on appeal that the superior court's findings of fact are not supported by substantial evidence, Powell has waived any claim that we should not consider these documents when reviewing the superior court's decision.

scared." Fraczek responded, "It'll be ok You'll make it through," "And I'm here with whatever you need," and "Plan B is gonna work though." Powell replied, "I'm sorry I'm a shitty asshole," to which Fraczek replied, "Sorry I'm a dick who doesn't have self control." Powell then responded, "I want to die," "It's not your fault," and "I'm the one who came up there and told you to fuck me."

Later that day, Powell communicated with Goodwin and Goodwin's impressions from that interaction were summarized in the Title IX investigation as follows:

> On [March] 18, 2019, Natasha sent Nastacia a text which stated "we fucking did it again." Natasha stated in the texts that she wanted to curl up and die. Natasha expressed self-loathing and guilt. Nastacia stated that the texts were similar to Natasha's reaction when she slept with Tomek previously. Natasha said she told Tomek that having sex was a bad idea. Nastacia took that as a normal interaction between Tomek and Natasha. Natasha would park by Tomek's house, they would drink, Natasha would say it was a bad idea, and they would end up sleeping together. . . .
> . . . .
> . . . In the context of the relationship between Tomek and Natasha it did not seem like saying sex was a "bad idea" meant they did not want to have sex.

In her petition for a domestic violence protection order, Powell alleged that, on March 17, 2019, Fraczek engaged in sexual intercourse with her despite her stating numerous times that she did not want to have sex.

Yet, considering all of the evidence summarized above, a fair-minded person could be persuaded that Fraczek did not sexually assault Powell on March 17, 2019. Indeed, Powell's text message, which stated, "I'm the one who . . . told you to fuck me," corroborates Fraczek's recollection of events wherein Powell said to him, "'what are we still doing out here, I want you to fuck me.'"

14

Additionally, Goodwin's recollection of Powell and Fraczek's interactions earlier in the night—particularly where Powell sat on Fraczek's lap at the bar and then expressed anger at him for touching her leg—align with Fraczek's declaration of what had transpired. From this evidence, a rational trier of fact could assign more credibility to Fraczek's account than to Powell's. Accordingly, the superior court's finding that Fraczek did not sexually assault Powell on this date is supported by substantial evidence.

F

Finally, substantial evidence supports the superior court's finding that Fraczek did not inflict on Powell a fear of imminent physical harm. During the hearing on Fraczek's motion for revision, the superior court stated, "What I see is a man that probably does not want to have contact with you" and "I do not believe that he has any interest in having anything, frankly, to do with you." Indeed, after Powell sent several text messages to Fraczek indicating that she did not consent to having sexual intercourse with him on March 17, 2019, Fraczek responded with text messages that said, "I'm staying away," "I will continue to give you space," "I will do my best so you don't have to see me." Likewise, in response to a text message from Powell which stated, "I'm not going to argue this with you I did not want sex I do not feel safe Please just leave me alone," Fraczek sent a text message that read, "Can do."

Fraczek also explained the circumstances surrounding several occasions during which he saw Powell following the conclusion of the Title IX investigation. According to Fraczek, he saw Powell on one occasion at the University of

15

Washington and, upon seeing her, he "panicked, wanted to turn and run, but in [his] fear all [he] managed was to turn 90 degrees and run face first into a wall." He then "lower[ed] his head[] and walk[ed] past [Powell] as quickly as possible, sticking as close to the wall as [he] could." On another occasion, Fraczek, along with some of his friends, entered a restaurant near the university and, upon entering, Fraczek "saw Natasha was standing in line." Fraczek stated that he "instantly turned on [his] heel [and] told [his] friends 'we're leaving' and walked away." Finally, Fraczek explained that he saw Powell several days after the temporary order of protection was entered. Fraczek went to the "Crags Climbing Center," which is located at the university. A police officer subsequently approached Fraczek and informed him that "she had received notification that [he] was at the climbing gym, and that Natasha wanted to come climb." The police officer escorted Fraczek out of the building, and Fraczek saw Powell "sitting on a bench." Fraczek told the police officer "that the complainant was sitting close by and asked the officer to escort [him] a bit further."

In her petition for a domestic violence protection order, Powell stated that Fraczek "has demonstrated a lack of boundaries that leaves me fearful for what he will do next. I am afraid for my life every time I am anywhere near the University of Washington."

Here, the superior court's findings that Fraczek did not sexually assault Powell are supported by substantial evidence. Additionally, both Fraczek's declaration and the text messages above provide a sufficient quantum of evidence to support the superior court's findings that Fraczek did "not want to

16

have contact with" Powell and that Fraczek did not "ha[ve] any interest in having anything . . . to do with" Powell.  Thus, a fair-minded person could be persuaded that Fraczek was not proved to have inflicted on Powell a fear of imminent physical harm.

Accordingly, the superior court did not abuse its discretion by denying Powell's petition for a domestic violence protection order.

III

A

Powell asserts that the superior court erred because substantial evidence exists within the record to support findings of fact that were not made by the court.[7]  Her argument is off the mark.  Powell's assignment of error, couched in terms of a lack of substantial evidence, asks us to afford more weight to certain evidence over other evidence in a manner that is favorable to her.  In short, she wants the evidence viewed in her favor.  Yet issues of credibility are resolved by the trier of fact, not the appellate court.  We are not a venue in which a party is allowed to re-litigate the entirety of its case.  As to fact-finding, our role is limited to determining whether the superior court was authorized to enter the findings of fact that it entered.  Because, as explained above, substantial evidence supports the superior courts findings, the court was so authorized.[8]

---

[7] Powell also wants us to review the findings of fact made by the commissioner.  This is contrary to law.  Just as we do not defer to the decision of the Title IX panel, we do not attribute any significance to the decision of the commissioner.  Neither the court commissioner nor those who served on the Title IX panel are elected judges.  Our review is confined to the decision made by the elected superior court judge.

[8] In her reply brief, Powell contends, for the first time, that the superior court's findings are not supported by substantial evidence because the superior court did not weigh the evidence. Again, Powell misconstrues what it means for a finding to be supported by substantial evidence. In any event, the record indicates that the superior court did, in fact, weigh the evidence:

Accordingly, the superior court did not err.

B

Powell and amici contend that the superior court abused its discretion by misinterpreting our Supreme Court's opinion in In re Marriage of Freeman, 169 Wn.2d 664, 239 P.3d 557 (2010).[9] Specifically, they assert that the superior court improperly interpreted the Freeman decision to provide that, in order to be

---

> So what I have to rely upon, of course, is the exact same thing that Commissioner Schaefer relied upon, which is the record before me. The record is huge, and I want to be very clear that I read -- I can't swear that I read every single text. I -- but I read the vast majority of them and all of the declarations and the declarations of the parties and all of the students, and I did review the Title IX investigation, and I did review that there were a lot of shifting accounts.

[9] In Freeman, our Supreme Court expressed a rule that has since been superseded by an act of the legislature. In Freeman, the Supreme Court stated that a superior court must make two determinations in order to grant a motion to modify or terminate a permanent domestic violence protection order. 169 Wn.2d at 672-74. First, the superior court must conclude, "by a preponderance of the evidence[,] . . . that [the moving party] will not resume acts of domestic violence." Freeman, 169 Wn.2d at 673. Second, the superior court must determine "whether the facts support a current reasonable fear of imminent harm." Freeman, 169 Wn.2d at 674.

In 2011, the legislature amended RCW 26.50.130 in response to the Freeman decision. This statute provides the current framework that must guide a superior court's decision to grant or deny a motion to terminate a permanent protection order:

> The court may not terminate an order for protection that is permanent or issued for a fixed period exceeding two years upon a motion of the respondent unless the respondent proves by a preponderance of the evidence that there has been a *substantial change in circumstances* such that the respondent is not likely to resume acts of domestic violence against the petitioner or those persons protected by the protection order if the order is terminated. In a motion by the respondent for termination of an order for protection that is permanent or issued for a fixed period exceeding two years, *the petitioner bears no burden of proving that he or she has a current reasonable fear of imminent harm by the respondent*.

RCW 26.50.130(3)(a) (emphasis added).

The legislature's amendment of RCW 26.50.130 did not supersede the requirement expressed in Freeman that the facts establishing a "fear of imminent physical harm," as provided in the definition of "domestic violence" in RCW 26.50.010(3), "must reasonably relate to . . . the fear of imminent harm." 169 Wn.2d at 674 (italicization omitted). Additionally, neither the Supreme Court's opinion in Freeman nor the legislature's amendment of RCW 26.50.130 changed the basic requirement that, for a domestic violence protection order to issue, the party seeking it must establish "the existence of domestic violence." RCW 26.50.030(1). Again, domestic violence is defined, in relevant part, as "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, sexual assault, or stalking . . . of one intimate partner by another intimate partner." RCW 26.50.010(3). Thus, to be entitled to a domestic violence protection order, Powell bore the burden of establishing that Fraczek engaged in one or more acts of domestic violence.

entitled to a domestic violence protection order, Powell was required to establish that she was not only assaulted by Fraczek, but also that Fraczek inflicted on her a fear of imminent physical harm.[10]

Even if the superior court misinterpreted Freeman to require such a showing in order for a petition for a domestic violence protection order to be granted, Powell fails to show how she was prejudiced by this. Indeed, the superior court found that Fraczek did not sexually assault Powell *and* that Fraczek did not inflict on Powell an imminent fear of physical harm. In other words, the superior court's decision was not based on an incorrect interpretation of Freeman. Rather, it was based on the fact that Powell had failed to meet her burden of proving that Fraczek engaged in *any* act of domestic violence.

Accordingly, the superior court did not abuse its discretion.

---

[10] Powell cites to the following musing of the superior court:

> I find, frankly, relying on Freeman v. Freeman, which is a Supreme Court case, I have to rely on that. There is an absolute requirement that . . . where the basis for a protection order is a past act of domestic violence, plus there has to be a present fear of imminent harm, the facts relied on have to be sufficient to persuade a rational person that such fear both subjectively exists and is objectively reasonable, and that is the part that . . . convinces me that this order needs to be removed.

> I do not find that your fear of . . . Mr. Fraczek is one that is based upon a rational belief . . . that you are in fear of imminent physical harm.

As explained in footnote 9, to establish a fear of imminent physical harm, the facts "must reasonably relate to . . . the fear of imminent harm." Freeman, 169 Wn.2d at 674 (italicization omitted). To the extent that the superior court interpreted Freeman to require such a showing, the superior court's statement was not improper.

In our view, the superior court may have been concerned by the emphasis placed by Powell on the commissioner's decision (an emphasis repeated in the briefs to us). The superior court may have believed that it was "terminating" the order entered by the commissioner. But, of course, this is not so. Because the commissioner is not an elected judge, the decision of the commissioner was prevented from becoming a final decision of the court by the filing of the motion for revision. No matter the heading on the caption, the order was only of temporary effect—awaiting the final decision of the elected superior court judge.

C

Powell and amici also assert that the superior court erred by not making an express finding as to whether she had the capacity to consent. In support of this claim, Powell cites to statutory provisions regarding sexual assault protection orders (codified in chapter 7.90 RCW) and case law interpreting those provisions.[11] However, Powell did not file a petition for a sexual assault protection order. Rather, she filed a petition for a domestic violence protection order pursuant to chapter 26.50 RCW. We apply statutes as they are written and adopted by the legislature. Unlike chapter 7.90 RCW, there is no language within chapter 26.50 RCW that mandates a trial court to find whether a petitioner had the capacity to consent to an alleged sexual assault. What was required under chapter 26.50 RCW was the entry of a finding of consent that was supported by substantial evidence in the record. More to the point, the record makes clear that testimony and evidence of Powell's capacity to consent was considered by the trial judge and is part of the substantial evidence that supports the court's finding of consent.

Accordingly, this assignment of error fails.

D

Powell and amici next contend that the superior court improperly considered Powell's past sexual behavior when it denied her petition for a domestic violence protection order. Specifically, they assert that the superior

---

[11] See Nelson v. Duvall, 197 Wn. App. 441, 456, 387 P.3d 1158 (2017) (interpreting the term "nonconsensual" in RCW 7.90.090(1)(a) to require the trial court to consider "evidence that the victim lacked the mental capacity to consent at the time").

court violated Washington "rape shield" laws when it considered evidence indicating that Powell had been raped in 2015. We disagree.[12]

As an initial matter, we recognize that the rules of evidence—other than those regarding privileges, RCW 9A.44.020, and ER 412—need not be applied in proceedings concerning petitions for domestic violence protection orders. ER 1101(c)(4).[13]

ER 412 provides, in pertinent part:

> **SEXUAL OFFENSES – VICTIM'S PAST BEHAVIOR**
> **(a) Criminal cases. [Reserved. See RCW 9A.44.020.]**
> **(b) Civil Cases; Evidence Generally Inadmissible.** The following evidence is not admissible in any civil proceeding involving alleged sexual misconduct except as provided in sections (c) and (d):
> (1) Evidence offered to prove that any alleged victim engaged in other sexual behavior.
> (2) Evidence offered to prove any alleged victim's sexual predisposition.

---

[12] Fraczek contends that, in the superior court, Powell did not "raise any issue or make any argument based on the rape shield statute, RCW 9A.44.020, or Evidence Rule 412 [and therefore] waived any alleged error in the trial court admitting the text messages." However, in her motion for reconsideration, Powell asserted that the superior court improperly considered the rape that she had experienced in 2015:

> Both opposing counsel and the Court indicated that petitioner's 2015 rape may have clouded her judgment about her interactions with the respondent. Past sexual abuse, assault or rape should not be used against a petitioner, just as past consensual sexual activity with a respondent does not indicate that a petitioner cannot be sexually assaulted by the respondent in the future.

Because Powell raised a claim of error as to the superior court's consideration of the rape that she had experienced in 2015, we consider her claim of error to be preserved.

[13] ER 1011 provides:

> **(c) When Rules Need Not Be Applied.** The rules (other than with respect to privileges, the rape shield statute and ER 412) need not be applied in the following situations:
>
> . . . .
>
> *(4) Applications for Protection Orders.* Protection order proceedings under Chapters 7.90, 7.92, 7.94, 10.14, 26.50 and 74.34 RCW. Provided when a judge proposes to consider information from a criminal or civil database, the judge shall disclose the information to each party present at the hearing; on timely request, provide each party with an opportunity to be heard; and, take appropriate measures to alleviate litigants' safety concerns. The judge has discretion not to disclose information that he or she does not propose to consider.

ER 412 makes clear that RCW 9A.44.020 does not apply to civil cases.

Nonetheless, this statute provides, in relevant part:

> Evidence of the victim's past sexual behavior including but not limited to the victim's marital history, divorce history, or general reputation for promiscuity, nonchasity, or sexual mores contrary to community standards is inadmissible on the issue of credibility and is inadmissible to prove the victim's consent except as provided in subsection (3) of this section, but when the perpetrator and the victim have engaged in sexual intercourse with each other in the past, and when the past behavior is material to the issue of consent, evidence concerning the past behavior between the perpetrator and the victim may be admissible on the issue of consent to the offense.

RCW 9A.44.020(2).

Powell and amici claim that the following excerpt from the hearing on

Fraczek's motion for revision demonstrates that the trial court violated ER 412:

> So what I have to rely upon, of course, is the . . . record before me.  The record is huge, and I want to be very clear that I read -- I can't swear that I read every single text.  I -- but I read the vast majority of them and all of the declarations and the declarations of the parties and all of the students, and I did review the Title IX investigation, and I did review that there were a lot of shifting accounts.  And I am not suggesting that, you know, you didn't win in that one and so you went ahead and changed your story up.
> What I'm suggesting is that, you know, talking to other people and experiencing the fear and the absolute emotional discomfort that Ms. Powell has, and that is absolutely objective to me.  I see you up here.  Your hands are shaking.  I watched the hearing before Commissioner Schaefer.  You were in a similar state of complete discomfort, so I don't minimize that at all.
> *But I think that perhaps your response and your reaction and speaking with people and, you know, other things that I can't process for you, you know, your past rape, all these other things perhaps contributed to a shift in the account of the three incidents and a narrative shifting of it.*  Again, I don't think anybody intentionally misrepresented anything to this court.

(Emphasis added.)

According to Powell and amici, the superior court improperly considered evidence indicating that Powell was raped in 2015 to explain why she may have believed that she was sexually assaulted by Fraczek. In making this argument, Powell and amici assert that evidence of the past rape was evidence of Powell's past sexual behavior. To the contrary, we will not hold that being raped is engaging in sexual behavior. There is no evidence that, in enacting RCW 9A.44.020, the legislature intended a "victim's past sexual behavior," a term referencing volitional acts, to encompass a rape. RCW 9A.44.020(2). Likewise, in adopting ER 412, there is no indication that our Supreme Court intended the phrase "engaged in other sexual behavior," a term describing volitional acts, to include rape. See ER 412(b)(1). The assertion by Powell and amici that being raped should be viewed as "engaging in sexual behavior" is repugnant.

Indeed, a prominent dictionary defines "behavior" as "[t]he manner in which one behaves." AMERICAN HERITAGE DICTIONARY at 167 (3d ed. 1992). Moreover, "behave" is defined as "[t]o conduct (oneself) in a specified way." AMERICAN HERITAGE, supra, at 167. Behavior, then, implies a sense of agency or control. It implies volition. But when an individual is raped, the victim does not exert agency or control over the encounter. Plainly, rape is not "past sexual behavior."

Moreover, there is no indication in the record that the superior court considered any of the evidence submitted by the parties for any improper purpose in violation of ER 412. Indeed, the superior court explained the purposes for which it considered the evidence as follows:

23

What I find the most important thing for me, other than the law, is the texts. They're important to me because they show me what I can't see otherwise, which is how -- what kind of relationship -- and I'm using that word loosely, because it was a loose relationship, but it was a relationship between two people that were in some ways very, very close, discussing every aspect of intimate, difficult topics repeatedly. . . .
. . . I spent my time -- most of my time, other than on the declarations, looking at the text messages, and really I did focus on immediately before and immediately after the three incidents in question because that was the most important to me.

Thus, the superior court analyzed the evidence in order to understand the relationship between Powell and Fraczek and the events surrounding the three incidents during which Powell alleged to have been sexually assaulted by Fraczek. There is no indication in the record that, in doing so, the superior court used the evidence to determine whether Powell engaged in any other sexual behavior or to establish Powell's sexual propensity. It did consider the event's possible impact on Powell's later perception of the events that transpired between Fraczek and Powell.

Accordingly, the superior court did not act contrary to ER 412.

E

Powell also contends that the superior court erred by considering the text messages that were filed by Fraczek because, she asserts, they lacked authentication, having been submitted in the form of Excel spreadsheets. This argument fails. As previously explained, the rules of evidence (except for those pertaining to privileges, the rape shield statute, and ER 412) are not applicable to protection order proceedings brought under chapter 26.50 RCW. ER 1101(c)(4). The requirement of authentication is contained within the rules of evidence. See

ER 901(a)[14]  Therefore, the superior court did not err by considering the text messages without requiring authentication of the type required by the rules of evidence.

F

Powell and amici next assert that the superior court erred by considering the text messages because, they contend, many of them were irrelevant and they were submitted by Fraczek merely to embarrass and humiliate Powell, thus depriving her of "meaningful access to justice."  We disagree.

Although the rules of evidence are not applicable to protection order proceedings brought pursuant to chapter 26.50 RCW, such proceedings must nevertheless meet basic due-process requirements.  Gourley v. Gourley, 158 Wn.2d 460, 467, 145 P.3d 1185 (2006).  "'The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'"  Gourley, 158 Wn.2d at 467 (internal quotation marks omitted) (quoting Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).  To determine what process is due in a particular case, we consider:

> (1) the private interest impacted by the government action; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the government interest, including the additional burden that added procedural safeguards would entail.

Gourley, 158 Wn.2d at 468 (quoting Mathews, 424 U.S. at 335).

---

[14] ER 901(a) provides the requirement that evidence be authenticated: "The requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Here, there was no risk of an erroneous deprivation of any interest. The text messages contained conversations between Powell and Fraczek that occurred both hours before and hours after the alleged incidents of sexual assault. This information was highly relevant to the issue of whether Fraczek sexually assaulted Powell on the dates in question. To the extent that these text messages contained any irrelevant information, the record indicates that the superior court did not consider such information. Indeed, the superior court explained that, while "looking at the text messages, . . . I did focus on immediately before and immediately after the three incidents in question."

The text messages that were exchanged between Powell and Fraczek in the time surrounding the alleged incidents of sexual assault contained information that was (1) inconsistent with Powell's account of events, (2) consistent with Fraczek's account of events, and (3) consistent with the account of events described by Narajala, Ghose, and Goodwin. In her declaration in support of her petition for a domestic violence protection order, Powell stated that she did not remember engaging in sexual intercourse with Fraczek on October 20, 2018, and January 11, 2019. However, on October 21, 2018, Powell sent Fraczek two text messages, which stated, "Dude this is so off topic but do you think you can get like hungover or have to come down from sex? Lol" and "Because I'm like sad and just want more sex now hahaha fuck my life." Additionally, in the days following January 11, 2019, Powell sent Fraczek multiple text messages referencing events that transpired moments before the alleged

26

incident occurred.  These text messages were inconsistent with Powell's declaration that she could not recall engaging in sexual intercourse with Fraczek.

Next, in the declaration in support of her petition, Powell stated that, on March 17, 2019, Fraczek engaged in sexual intercourse with her despite her numerous statements that she did not want to have sex.  But hours after Fraczek allegedly sexually assaulted her, Powell sent Fraczek a text message, which stated, "I'm the one who came up there and told you to fuck me."  This text message was inconsistent with Powell's account and, thus, was relevant to the issue of whether Fraczek was more truthful in his account of events.

Next, the text messages were relevant to the issue of whether Fraczek sexually assaulted Powell because they were consistent with Fraczek's recollection of what had transpired on the three dates in question.  In his declaration, Fraczek stated that, prior to engaging in sexual intercourse on October 20, 2018, Powell "kept saying things like 'oh god I want to fuck you.'" Regarding the incident on January 11, 2019, Fraczek stated that he and Powell did not consume any alcohol while playing video games with his roommates. Finally, with regard to the March 17, 2019, incident, Fraczek stated that, prior to engaging in sexual intercourse, Powell said to him "what are we still doing out here, I want you to fuck me."  The text messages quoted above are consistent with, and relevant to, the statements made in Fraczek's declaration.  Moreover, the statements made by Fraczek in these text messages were relevant because they provided context to the statements made by Powell.

Finally, the text messages were relevant because they were consistent with, and added credibility to, the accounts of Narajala, Ghose, and Goodwin regarding the events. Powell alleged that she did not recall having sexual intercourse with Fraczek on January 11, 2019. However, Narajala's declaration provided that, "[n]one of us had any drinks and I saw no signs that Natasha was drunk" and that Powell's claim "that she blacked out" "simply does not fit with . . . everything that I observed that evening." Similarly, Ghose's declaration provided that Powell "was not unsteady or halting" and "none of us had anything to drink during the time we played the game, and I do not believe Tomek ever had drinks in his room." The text messages from Powell referencing details from the video game that she, Fraczek, Narajala, and Ghose played on January 11, 2019, are consistent with, and thus relevant to, the veracity of the declarations of Narajala and Ghose.

Additionally, in a document from the Title IX investigation, Goodwin is summarized as describing her conversation with Powell after the incident on March 17, 2019. In this conversation, Powell "said she told Tomek that having sex was a bad idea," "expressed self-loathing and guilt," and "stated . . . that she wanted to curl up and die." Similarly, Powell's declaration in support of her petition provides that, when she informed Fraczek that she did not consent to having sexual intercourse with him, she stated, among other things, that "this is a bad idea." However, according to Goodwin, "it did not seem like saying sex was a 'bad idea' meant [that Powell and Fraczek] did not want to have sex." Goodwin stated that, on previous occasions, "Natasha would park by Tomek's house, they

would drink, Natasha would say it was a bad idea, and they would end up sleeping together."

The text messages between Powell and Fraczek are consistent with Goodwin's account. On March 18, 2019, Powell texted Fraczek, "You're all better off without me, especially you," "I want to die," "I hate myself," and other text messages that may be described as expressing "self-loathing and guilt." Additionally, these text messages provided context regarding why Powell was making these statements. For example, Powell sent a text message to Fraczek at 3:37 p.m. on March 18, 2019, which provided:

> This is probably going to hurt but I have someone I love more than anything and wanted to spend my life with and now I might be fucking pregnant because I'm a piece of fucking shit that has no self control I'm horrible and I deserve to be miserable and alone and to die How could I do this to him? ( I want to die[.]

These text messages are consistent with, and relevant to, Goodwin's belief that, when Powell said that sex with Fraczek was a "bad idea," she did not mean that she did not consent to having sexual intercourse with him.

In sum, the text messages did not function to embarrass or harass Powell. Rather, they were directly relevant to the issue of whether Fraczek had sexually assaulted Powell. Accordingly, the superior court's consideration of the text messages did not deprive Powell of any process due to her.

Affirmed.

_Dwyer, J._

WE CONCUR:

_Hazelrigg, J._          _Appelwick, J._